UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PMI MORTGAGE INSURANCE CO.,

    Plaintiff,

    v.

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,

    Defendant.

No. C 02-1774 PJH

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter was tried before the court for one day on October 23, 2006. Plaintiff PMI Mortgage Insurance Co. ("PMI") has brought an action against defendant American International Specialty Lines Insurance Co. ("AISLIC")[1] seeking indemnity as a result of AISLIC's refusal to provide coverage, under the terms of its insurance policy with PMI, for a loss that PMI incurred in connection with the settlement of a class action lawsuit. PMI asserts two causes of action against AISLIC: (1) for declaratory relief regarding AISLIC's duty to indemnify; and (2) breach of contract for failure to indemnify. PMI appeared through its counsel, David B. Goodwin and Christopher F. Stoll, and AISLIC appeared through its counsel, Richard M. Williams and Michael J. Quinn.

**FINDINGS OF FACT**

The court has attempted to "avoid commingling findings of fact with conclusions of law." Lieber v. Macy's West, Inc., 80 F. Supp. 2d 1065, 1066 n.1 (N.D. Cal. 1999). To the

---

[1] Plaintiff initially brought suit against two additional defendants, Federal Insurance Company ("Federal"), and Columbia Casualty Company ("Columbia"). However, both Federal and Columbia settled with plaintiff, and were dismissed from the instant action on October 23, 2006.

extent this effort fails, "any conclusions that are inadvertently labeled as findings (or vice versa) shall be considered 'in [their] true light, regardless of the label that the . . . court may have placed on [them].'" Id., quoting Tri-Tron International v. Velto, 525 F.2d 432, 435-36 (9th Cir. 1975).

The majority of the court's findings of fact were stipulated to by the parties in their joint pretrial statement, and are incorporated herein, as follows. Citations to the record are provided for those findings not taken from the joint pretrial statement.

A.  PMI

PMI has been in the mortgage insurance business since 1972. It is one of the nation's leading providers of mortgage insurance and related services to residential mortgage lenders. Residential mortgage lenders – such as banks and savings and loans – often purchase mortgage insurance when issuing home loans to individuals purchasing homes with down payments of less than 20% of the purchase price. Mortgage insurance covers the residential mortgage lenders for certain financial losses in the event a home owner fails to repay his or her home loan. In essence, mortgage insurance provides protection for the residential mortgage lenders' interest in the underlying property values.

PMI issues its mortgage guaranty insurance to residential mortgage lenders directly, rather than selling mortgage insurance to the actual borrowers who take out loans to purchase their homes. The lenders typically buy a master mortgage insurance policy from PMI, which master policy in turn covers a group of mortgage loans that the lender itself makes or acquires. PMI issues a certificate of insurance to the lender for each loan that the lender wants covered under the master policy.

Under the terms of the mortgage insurance policies, the lenders are therefore the "Insureds." To that end, it is the mortgage lenders, and not the borrowers, who pay premiums to PMI for mortgage insurance. Each mortgage lender makes its own decision about whether to absorb the cost of the mortgage insurance premiums, or whether to pass on the cost of the premiums to borrowers. In some instances, the lender passes the cost of

mortgage insurance premiums on to borrowers by adding a charge for mortgage insurance to the borrower's mortgage payments. In other instances, the lender will choose to pay the mortgage insurance premium. Where this occurs, however, the lender typically issues loans to borrowers that carry a higher interest rate than other home loans.

### B.    The Baynham Action

On December 17, 1999, a nationwide class action was filed against PMI in federal court, in the Southern District of Georgia. The action, entitled Baynham et al. v. PMI Mortgage Insurance Co., No. CV 199-241 (the "Baynham action"), was brought on behalf of a nationwide class of borrowers who had taken out mortgage loans that PMI insured.

The Baynham plaintiffs alleged that, in exchange for residential mortgage lenders' agreement to send mortgage insurance business to PMI, PMI provided various additional services and benefits to the lenders. The Baynham plaintiffs further alleged that by providing these services to lenders in the hope of getting increased mortgage insurance business, PMI violated the law, specifically, the federal Real Estate Settlement Practices Act ("RESPA"). The Baynham plaintiffs' original and first and second amended complaints alleged a single cause of action under RESPA.

On June 12, 2000, PMI filed a motion for summary judgment in the Baynham action, asserting several defenses to liability, including defenses based on standing, the RESPA statute itself, the insurance rate doctrine, and the McCarran-Ferguson Act. On August 14, 2000, the district court granted summary judgment in PMI's favor, ruling that the Baynham plaintiffs' RESPA claim was barred by the McCarran-Ferguson Act. The court did not reach the merits of the other defenses raised by PMI.

Meanwhile, as the summary judgment motion was underway, PMI and the Baynham plaintiffs had begun settlement discussions. In December 2000, after the district court had reached its decision on PMI's summary judgment motion, the parties finally reached agreement on settlement.

Three primary factors motivated PMI to settle the case. First, even though PMI had

prevailed on summary judgment, the district court had limited its grant of summary judgment to the McCarran-Ferguson Act defense only, which PMI considered to be one of its least meritorious arguments. PMI was concerned that on appeal, the Eleventh Circuit might reverse the McCarran-Ferguson ruling, which would require further litigation of PMI's other defenses on remand to the trial court before PMI could prevail. Second, even if the Eleventh Circuit were to affirm the summary judgment ruling, PMI was concerned that other plaintiffs might file class actions against it in other jurisdictions, under state unfair practices statutes or state common law theories. Third, PMI was concerned about the potential defense costs that would result from continuing to litigate the Baynham action, or as a result of other potential state class actions. In the absence of a settlement, PMI believed these costs would be substantial. PMI's decision to enter into the Baynham settlement was not based on consideration of insurance coverage. See Testimony of James McCabe.

In view of these concerns, during settlement negotiations, PMI took the position that it would only settle the Baynham lawsuit if a nationwide class were certified and the class members furthermore agreed to release, on a nationwide basis, all claims arising out of the practices challenged in the action, including any claim that could be asserted under state law. To that end, the parties agreed that, in connection with the parties' request for court approval of the settlement, the Baynham plaintiffs would seek leave to file a third amended complaint in the action, which would differ from prior iterations of the Baynham plaintiffs' complaint by including two causes of action in addition to plaintiffs' first cause of action under RESPA: a second cause of action would be brought under state law, would allege PMI's violation of the unfair and deceptive acts and practices laws of the various different states in which the Baynham plaintiffs lived, and would include a claim for violation of the common law of each state. The third and final cause of action would seek injunctive relief to enjoin PMI from engaging in its allegedly wrongful practices.

PMI intended that the additional state law claims in the third amended complaint would highlight not only the fact that these claims were being included in the litigation, but

that they were being specifically included in the release that the class members would be giving in exchange for class settlement benefits. See Deposition of Michael Calhoun at 15:13-16:14; Deposition of Michael Spencer at 33:15-24; Deposition of Michael Agoglia at 97:17-25 (inclusion of state law claims in third amended complaint was intended to "shore up the enforceability of the release language itself").

The district court preliminarily approved the settlement on December 20, 2000. In connection with its preliminary approval, the court allowed the Baynham plaintiffs to file a third amended complaint in the action that included the two additional claims, the filing of which was conditional upon final approval of the settlement. In the event final approval was denied and litigation resumed, the third amended complaint was to be stricken, and the second amended complaint that had theretofore been in effect would continue as the operative pleading in the case.

This never occurred. On June 25, 2001, the district court granted final approval of the Baynham settlement. The district court's order granting final approval noted the "substantial obstacles" and difficulties that the Baynham plaintiffs would have had to overcome in order to succeed on the merits of their claims, and found the settlement fair, adequate, and reasonable, particularly in view of "the very real probability that the class members could receive nothing" if they proceeded through what the court deemed "complex, expensive, and lengthy" litigation.

C.     The Baynham Settlement

Under the terms of the settlement, the Baynham plaintiffs agreed to release all claims against PMI and/or PMI's lenders under "RESPA, federal or state antitrust laws, state insurance statutes and regulations, including without limitation, state anti-rebate and anti-inducement statutes and regulations, state consumer protection laws, or any other federal, state or local law, statute or regulation (including, but not limited to, any and all federal and state statutory, administrative, regulatory, or common law claims, including those for fraud and punitive damages)...". In exchange, PMI agreed to make a settlement

5

payment that included payments to eligible class members and payments to charity, as well as payments for the Baynham plaintiffs' attorneys' fees, and the costs of administering the settlement.

With respect to the class members specifically, PMI agreed to pay each eligible class member an equal amount from a settlement fund that PMI was to create, which fund would be administered by an independent settlement administrator. The settlement agreement calculated the amount of each class member's benefit according to a formula that was based on the total number of claims that the Baynham plaintiffs submitted. The settlement payment to each class member was a flat amount paid on a per-loan basis, and did not depend on the size of a given class member's mortgage, or the amount of mortgage insurance charges that the lender had asked a given class member to pay. See Testimony of James McCabe. After all claims had been received and processed, PMI paid each eligible class member $35.47 from the settlement fund.

Neither the Baynham settlement agreement nor any other document or agreement admitted into evidence at trial allocated any payments under the Baynham settlement among the RESPA and state law claims that were asserted in the Baynham plaintiffs' third amended complaint. There is no evidence that the parties to the Baynham action made any representations to the district court concerning such allocations, and the district court's final approval order made no mention of allocation of the settlement payments among the causes of action asserted in the third amended complaint. Counsel for PMI never discussed the allocation of payments with the Baynham plaintiffs' counsel, nor made any apportionment. See Testimony of James McCabe; Deposition of Michael Calhoun at 18:24-19:9, 59:22-60:8.

On November 11, 2003, PMI sent $16,681,481.44 to the settlement administrator as its contribution to the settlement fund. From this fund, the administrator distributed the payments to the plaintiffs and class members, charities, and plaintiffs' counsel. On July 19, 2004, the administrator sent $2,573,688.72 back to PMI as a refund of the portion of the

settlement fund that remained unused because benefit checks to class members were not cashed or were returned as undeliverable by the postal service. Therefore, when the settlement was completed, PMI had paid a total of $14,107,792.72 into the settlement fund for class member settlement benefits, charity payments, and attorneys' fees. With the addition of its payments for administrative costs of the settlement, the total settlement costs paid by PMI were $14,659,889.89.

In addition to its contributions to the settlement fund and administrative costs, PMI also contributed additional money in connection with the defense costs of the settlement. In all, PMI paid $16,667,651.60 in settlement fund payments, administrative expenses, and defense expenses associated with the Baynham action.

D. The AISLIC policy

PMI is insured by AISLIC under a Financial Institution Professional Liability Insurance Policy. This policy was in effect from April 10, 1998 to April 10, 2001. Under the terms of the policy, AISLIC agreed to pay PMI up to $10 million in excess of a $200,000 retention for certain losses arising from claims first made against PMI during the policy period as a result of any wrongful act in the rendering or failure to render professional services.

The coverage provision of the AISLIC policy provides:

> "This policy shall pay the Loss of the Insured arising from a Claim first made against the Insured during the Policy Period or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act of any Insured in the rendering or failure to render Professional Services. The Insurer shall, in accordance with and subject to Clause 8, DEFENSE COSTS, SETTLEMENTS AND JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS), advance Defense Costs of such Claim prior to its final disposition." See id.

The AISLIC policy furthermore defines "Loss" in part as follows:

> "(g) 'Loss' means damages, judgments, settlements and Defense Costs, and any payment made by the Insurer pursuant to Clause 19, COST OF CORRECTIONS; however, Loss shall not include:

7

> * * *
> (ii) the cost of complying with any settlement for or award of non-monetary relief;
>
> * * *
> (iv) civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed; notwithstanding the foregoing, Loss shall include awards of punitive or exemplary damages (where insurable by law);
>
> * * *
> (vii) fees, commissions, or other compensation for any Professional Services rendered or required to be rendered by the Insured or that portion of any settlement or award in an amount equal to such fees, commissions, or other compensation."

PMI gave timely and proper notice of the Baynham lawsuit pursuant to the policy, and filed a claim for coverage under the policy within the policy period. Specifically, PMI sought coverage for the monies that PMI had expended in connection with the defense and settlement of the Baynham action.

AISLIC denied coverage. In response, PMI filed the instant action seeking indemnification. Prior to its official denial of coverage, however, AISLIC chose to reimburse PMI for $1,445,410.45 in defense costs that PMI had incurred in the Baynham action (after PMI paid the $200,000 retention amount). In addition, AISLIC paid PMI under the policy in connection with different, unrelated claim amounts. As such, between the defense expenses already reimbursed in connection with the Baynham action, and the payments made on unrelated claims, AISLIC has already paid PMI a total of $2,390,244 under the terms of its policy. Accordingly, the available policy limits have been reduced, and $7,609,756 actually remains available to PMI for payment of claims under the terms of the AISLIC policy. PMI seeks indemnification up to these remaining limits.

**CONCLUSIONS OF LAW**

The only issue before the court is whether the Baynham settlement constitutes "loss" within the meaning of the AISLIC insurance policy, thereby triggering AISLIC's duty to

provide coverage under the policy.  The AISLIC policy, as found above, defines "loss" as "damages, settlements and Defense Costs," but excludes from that loss: (1) "fees, commissions, or other compensation for any Professional Services rendered or required to be rendered by the Insured or that portion of any settlement or award in an amount equal to such fees, commissions, or other compensation"; (2) "the multiplied portion of multiplied damages"; and (3) "matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed."  AISLIC contends, and PMI refutes, that the Baynham settlement falls within these three exclusions, thereby eliminating coverage.

Preliminarily, the court notes that it has considered this issue previously, in connection with the parties' cross-motions for summary judgment.  There, the court construed the AISLIC policy to require defendants to pay the whole of any "loss" arising from a qualifying "claim," except for any portion of the settlement that defendants were able to prove is excluded from the policy's definition of "loss."  See Order Granting Summary Judgment in Part and Denying Summary Judgment in Part ("MSJ Order") at 16; see also Garvey v. State Farm Fire & Cas. Ins. Co., 48 Cal. 3d 395, 406 (1989)(once the insured shows that an event falls within the scope of basic coverage under the policy, the burden is on the insurer to prove a claim is specifically excluded).  The court further held that the whole of the Baynham settlement paid by PMI is affirmatively covered as a "loss" under the AISLIC policy, but left for trial the issue whether some portion of the settlement, if any, is covered by any of the exclusions set forth above.  See MSJ Order at 16-17.

Accordingly, here AISLIC must prove what portion, if any, of the Baynham settlement specifically falls within the loss exclusions contained in the AISLIC policy.  For the following reasons, AISLIC fails to meet this burden.

    A.    Allocation Standard

In order to succeed in proving that the Baynham settlement falls within the AISLIC policy's three loss exclusions, AISLIC must offer nonspeculative evidence sufficient to establish the identification, allocation, and quantification of specific settlement amounts that

are subject to the three exclusions.  See, e.g., Golden Eagle Refinery Co., Inc. v. Assoc. Int'l Ins. Co., 85 Cal. App. 4th 1300, 1309-10, 1314 (2001)(requiring allocation of environmental contamination damages as part of indemnification claim); Lockheed Corp. v. Continental Ins. Co., 134 Cal. App. 4th 187, 218-19 (2005)(same).  If AISLIC cannot do so, it cannot succeed in its quest to demonstrate that the exclusions bar coverage for the whole of the Baynham settlement "loss."

B. Failure to Allocate

AISLIC's argument for exclusion is premised on the assumption that the whole of the Baynham settlement was consideration for release of the Baynham plaintiffs' RESPA claim alone.  Under this assumption, AISLIC contends that the Baynham settlement reflects the damages amounts that the Baynham plaintiffs' could have recovered pursuant to their RESPA claim, which damages amounts expressly fall into the three loss exclusion categories delineated in the AISLIC policy.

The first problem with this argument is that it ignores the presence of the state law claims included in the Baynham plaintiffs' third amended complaint, which was filed in conjunction with the parties' request for court approval of the settlement.  As the court has found, based on the testimony of both the Baynham plaintiffs' and PMI's counsel in the Baynham action, the additional state law claims included in the third amended complaint were expressly intended to apply to the Baynham settlement, and to make the release of claims by the plaintiffs *broader* than those listed in the second amended complaint.  See, e.g., McCabe Testimony; Deposition of Michael Calhoun at 15:13-16:14.  To that end, the Baynham settlement is properly understood as having been negotiated and executed in exchange for a release of not only the Baynham plaintiffs' RESPA claim, but state law claims as well.

As such, before AISLIC can prove that any portion of the Baynham settlement falls into any of the three loss exclusions set forth in the AISLIC policy – and whether, specifically, some portion reflecting RESPA damages fall into those exclusions – AISLIC

must first be able to prove what portions of the settlement were, or can be, allocated among the RESPA and state law causes of action.

This leads to the second, and critical, problem with AISLIC's evidence and argument. There is simply no evidence introduced by AISLIC that would allow the court to allocate PMI's payments under the Baynham settlement among the state law and RESPA claims with the requisite precision. To the contrary, neither AISLIC nor PMI disputes that neither the underlying parties nor the district court performed *any* allocation of the settlement payments among the various causes of action alleged in the third amended complaint. Indeed, even PMI's attorney in the underlying action, James McCabe, testified that there was no discussion of allocation during settlement negotiations, nor is there any link between the specific claims alleged by the Baynham plaintiffs, and any allocation to corresponding settlement amounts.

Since AISLIC cannot point to any evidence that demonstrates the existence of any settlement sum attributable to *any* of the claims alleged by the Baynham plaintiffs in the third amended complaint, AISLIC cannot demonstrate that any articulable settlement sums correspond to RESPA damages amounts, and further cannot demonstrate that these sums in turn qualify under any of the three loss exclusions in its policy.[2]

In sum, AISLIC has failed to carry its burden of identifying, allocating, and quantifying, by dollar amount or percentage, any portion of the Baynham settlement that is subject to any of the three loss exclusions that it invokes. AISLIC's failure to present any such evidence is fatal to its defense, and provides no impediment to PMI's ultimate claim for indemnification.

Moreover, as PMI correctly points out, AISLIC does not dispute that certain portions of the Baynham settlement paid by PMI – approximately $5 million – *are* covered by the

---

[2] AISLIC has not even attempted to argue or prove that any of the loss exclusions in its policy would cover any settlement amounts that would correspond to the state law claims at issue. However, even if it had, this argument would still be unpersuasive, due to AISLIC's failure to introduce any evidence of allocation.

11

AISLIC policy.  Specifically, AISLIC does not dispute that the amounts paid by PMI pursuant to the settlement in the form of attorneys' fees, payments to charity, and administrative expenses, as well as the defense costs advanced to PMI, are covered as "loss" under the policy.  Nor has AISLIC introduced any evidence demonstrating that these amounts fall into any of the three loss exclusions it asserts.  Accordingly, these amounts, as with the remainder of the Baynham settlement for which AISLIC fails to prove any allocation of sums, qualify as "loss" under the terms of the AISLIC policy.  As such, AISLIC is required to indemnify PMI for the whole of the Baynham settlement amounts paid by PMI.

AISLIC attempts to avoid this result by arguing that the court should adopt an equitable approach to allocation.  AISLIC proposes, for example, what the court deems a "timeline" approach, whereby AISLIC suggests that the court may allocate the Baynham settlement according to a timeline that reflects the amount of time that the three causes of action present in the third amended complaint were actually litigated, in view of the Baynham action as a whole.  There is, however, no evidence that AISLIC can point to that would support such an timeline approach.  AISLIC points to no testimony by any witness, nor to any documents, nor even to any legal authority, that supports this proposed approach.  As such, the court's adoption of such an approach is neither warranted nor feasible.

In conclusion, there is simply no evidentiary support for concluding that any portion of the Baynham settlement may be allocated or attributed solely to PMI's RESPA cause of action, let alone for attributing such amounts to RESPA damages that would flow from the claim which would furthermore be covered by the three specific loss exclusions at issue.

This conclusion is further buttressed by the fact that, even assuming that AISLIC were able to prove that the Baynham settlement could be apportioned to determine what settlement sums correspond to the RESPA claim, AISLIC would still have failed to satisfy its burden of proving that the three "loss" exclusions it invokes under the AISLIC policy

12

actually operate to bar coverage for any portion of those sums.  First, AISLIC introduced no evidence at trial – through admission of either testimony or documentary evidence – that any payment made by PMI as part of the Baynham settlement are equal to any fees, commissions, or other compensation that the Baynham plaintiffs may have paid to PMI.  Moreover, Mr. McCabe expressly testified that the payment amount made to each Baynham plaintiff under the settlement was fixed, and not related to the amount of mortgage insurance premiums or other fees that the lenders paid to PMI for PMI's services.

Second, AISLIC introduced no evidence at trial that the settlement sums paid by PMI fall within the exclusion from "loss" for the "multiplied portion of multiplied damages." Although RESPA provides for multiplied damages as a potential remedy upon successful prosecution of a claim, here, the claim was never fully prosecuted, but rather terminated beforehand via settlement.  See, e.g., Nordstrom, Inc. v. Chubb & Sons, Inc., 820 F. Supp. 530, 537 (W.D. Wash. 1992)(where fact of settlement "precluded any possibility of a treble damage award," multiplied award could not be deemed part of settlement paid by the insured).

Finally, AISLIC offered no evidence or legal authority that any payment made by PMI as part of the Baynham settlement is "uninsurable" as a matter of law, such that it cannot be qualified as "loss."  Although AISLIC contends that the settlement reflects damages in the form of disgorgement, which is technically uninsurable in California as a matter of public policy, AISLIC has presented no evidence that the Baynham settlement provided for any disgorgement of monetary amounts to the plaintiff class, or even that PMI ever affirmatively received any sums of money from the Baynham plaintiffs, such that these amounts could even be deemed disgorgement damages in the first place.

For the above reasons, and in consideration of all the evidence presented, the court finds that AISLIC has not met its burden of demonstrating that any "loss" exclusion contained within the AISLIC policy applies to the Baynham settlement amounts paid by PMI in connection with the underlying Baynham action.  PMI is therefore entitled to be properly

indemnified, up to the remaining limits of the policy.

PMI is also entitled to an award of prejudgment interest at the statutory rate. PMI shall submit a request for prejudgment interest within one week of the date of this order. AISLIC shall have one week thereafter to submit any response. PMI shall also submit a proposed form of judgment along with its request for prejudgment interest.

## CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law, judgment is entered in favor of PMI and against AISLIC. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: November 13, 2006

_____
PHYLLIS J. HAMILTON
United States District Judge